## UNITED STATES v. SOUTHERN PAC. CO. et al.

(District Court, D. Utah. June 18, 1923.)

No. 3375.

**Appeal and error ⟨⇒⟩1195(4)—On remand after reversal, court authorized to conform its decree to changed legal conditions.**

    In suit to compel relinquishment of control of one railroad by another as in violation of the Sherman Law (Comp. St. § 8820 et seq.) and the Pacific Railroad Acts (Act July 1, 1862, and its amendments or supplements) decree for defendant was reversed by the Supreme Court on the ground that such control violated the Sherman Act, but the decision on reversal made no mention of and did not affect the right of the controlling railroad to apply to the Interstate Commerce Commission, under Interstate Commerce Act, § 5, par. (2), as amended by Transportation Act 1920, to acquire control of the other railroad, and after rendition of such decision the controlling road made such application and was granted the right by the Interstate Commerce Commission to acquire such control, and proceeded to do so by lease authorized by the Commission. *Held,* on remand to the District Court, that the decree of that court would recognize as valid the existing lease arrangement as authorized by the Commission, and the railroads would be relieved of the operation of the Sherman Law so far as necessary to enable them to do anything authorized or approved by the Commission.

In Equity. Suit by the United States against the Southern Pacific Company and others. Decree for defendants was reversed by the Supreme Court of the United States (259 U. S. 214, 42 Sup. Ct. 496, 66 L. Ed. 907; Id., 42 Sup. Ct. 587, 67 L. Ed. ——), and the cause remanded. Final decree on mandate.

See, also, 76 Interst. Com. Com'n R. 508.

James M. Beck, Sol. Gen., of Washington, D. C., and Edward F. McClennen, Sp. Asst. Atty. Gen. (H. M. Daugherty, Atty. Gen., on the brief), for the United States.

Cordenio A. Severance, of St. Paul, Minn., and Joseph P. Blair, of New York City (Wm. F. Herrin and Garret W. McEnerney, both of San Francisco, Cal., and Fred H. Wood and Elmer Schlesinger, both of New York City, on the brief), for defendants other than Central Union Trust Co.

SANBORN, LEWIS, and KENYON, Circuit Judges. The above case having heretofore come on for hearing before this court, and having been determined in favor of defendants, and a final decree rendered on March 9, 1917, that the petition be dismissed for want of equity, and the said cause having been appealed by the United States, petitioner, to the Supreme Court of the United States, and that court having reversed the decree of this court, and a mandate from the Supreme Court in proper form having been filed herein on the 17th day of October, 1922, which mandate directs that such further proceedings be had in this cause, in conformity with the opinion and decree of the Supreme Court, as according to right and justice, and the laws of the United States, ought to be had:

Now, therefore, this cause having come on for hearing at the present term before SANBORN, LEWIS, and KENYON, Circuit Judges, on the application of the United States for the entry of a final decree pursuant to said mandate, and upon the petition of the Southern Pacific Company, one of the defendants herein, that in entering any decree herein due recognition be accorded and due effect be given to certain rights acquired by it subsequent to the said decision of the Supreme Court in virtue of the exercise by the Interstate Commerce Commission in its behalf of certain powers conferred by the Transportation Act 1920 (41 Stat. 456), hereinafter more fully referred to, and having been argued by counsel, it was ordered, adjudged and decreed as follows, viz.:

## Part I.

1. The petition in this cause was filed in this court on February 11, 1914. It charged that the then existing control of the Central Pacific Railway Company by the Southern Pacific Company, by lease and by stock ownership, was in violation of the Act of July 2, 1890, known and hereinafter referred to as the Sherman Law (Comp. St. § 8820 et seq.), and was also in violation of the provisions of the Act of Congress of July 1, 1862 (12 Stat. 489), and its amendments or supplements, hereinafter referred to as the Pacific Railroad Acts. The prayer of the petition was that the lines of the Southern Pacific and those of the Central Pacific be decreed to constitute competitive systems, and that the ownership acquired by the Southern Pacific of all or a controlling interest in the capital stock of the Central Pacific, and its lease, control, and operation of the lines thereof be declared violative of the Sherman law, and that the Southern Pacific be required to dispose of such capital stock, and cancel and relinquish its lease, control, management, and operation thereof, and that the said control be decreed to be in violation also of the Pacific Railroad Acts. The lease referred to in the petition was a lease entered into February 17, 1885, with subsequent amendments. The ownership of stock complained of in the petition was acquired in 1899.

On March 9, 1917, this court rendered a final decree in favor of defendants, holding that the said control violated neither the Sherman Law nor the Pacific Railroad Acts, and the United States appealed. The case on appeal was argued and submitted in the Supreme Court in April, 1921, and was reargued and resubmitted in April, 1922. The decision of the Supreme Court was rendered May 29, 1922. That decision does not mention the Transportation Act, 1920. An application to the Supreme Court for a rehearing and a brief in support thereof were filed by defendants. In neither was there any reference to the Transportation Act, 1920. The Supreme Court, on October 9, 1922, denied a rehearing and in its denial made no reference to the Transportation Act, 1920. At the time of the decision of the Supreme Court and at the time of its denial of a rehearing the Southern Pacific had made no application to the Interstate Commerce Commission to acquire control of the Central Pacific under the Transportation Act, 1920, nor had the Commission adopted a final plan of consolidation under the terms of that act, nor had any action been taken by the Commission or

the parties to this cause to make said act effective upon the case before the Supreme Court.

By its decision the Supreme Court found the control complained of —i. e. by the lease of 1885 and its amendments and through the stock ownership acquired in 1899—to be' a restraint of trade within the prohibition of the Sherman Law. The charged violation of the Pacific Railroad Acts was not passed upon by the Supreme Court. Its decision did not affect the right of the Southern Pacific Company to apply to the Interstate Commerce Commission under paragraph (2) of section 5 of the Interstate Commerce Act, as amended by the Transportation Act, 1920 (41 Stat. 481), to acquire control of the Central Pacific or the power and duty of the Commission to act upon any such application when made, nor did it decide the effect upon this case of favorable action by the Commission upon any such application.

2. On October 17, 1922, the Southern Pacific Company filed an application with the Interstate Commerce Commission under paragraph (2) of section 5 of the Interstate Commerce Act, as amended by the Transportation Act, 1920, for authority to acquire control of the Central Pacific Railway Company to the following extent and by the following means, namely: '(a) By lease until December 31, 1984, subject to termination by order of the commission, if and when found by the commission to interfere with the consummation of its final plan of consolidation when promulgated under section 5 of the Interstate Commerce Act, as amended; and (b) by ownership of all the issued and outstanding capital stock of the Central Pacific Railway Company during the continuance of the lease. The application alleged that the control applied for would be in the public interest, and set forth the facts and conditions supporting this allegation, and invoked a finding and order from the Commission approving and authorizing the proposed lease and the stock ownership as in the public interest. The Commission set down the said application for hearing at a time and place named, and, in accordance with its rules and regulations governing such applications, notified the Governors and the Public Service Commissions of the states in which the lines of the Central Pacific Railway Company are located, namely California, Utah, Nevada, and Oregon, of the time and place fixed for the hearing. The said states appeared and intervened through authorized representatives and participated in the further proceedings under the application. The states of Colorado, Arizona, Idaho, Wyoming, and Nebraska intervened and took part through their representatives in the further proceedings under the application. The shipping public in the above-named states and other states were further represented by numerous civic associations, commercial bodies and individuals, who intervened and took part in the hearing upon said application.

Among other interveners was the Union Pacific Railroad Company, which filed a motion to dismiss the application for want of jurisdiction. This motion was set down for hearing and, after argument by counsel, was denied by the Commission. After an extended hearing, at which testimony was taken and other evidence offered and filed by applicant tending to prove the allegations of its said application, and

by the notified states and by the interveners for and against the application, the matter was set down for argument for January 19, 1923, and then, after argument by counsel, was submitted and taken under advisement by the Commission. On the 6th day of February, 1923, the Commission rendered its report and decision upon the said application, and, after stating the nature of the case and the proceedings therein and the pertinent facts established at the hearing, found the aforesaid proposed lease to be in the public interest, and the aforesaid stock ownership to be in the public interest, and by order approved and authorized the acquisition of the control applied for, and found the terms and conditions of such acquisition which it deemed reasonable and just to impose, and directed the Southern Pacific Company to file with it, at least 10 days before the execution of the authorized lease, a copy thereof substantially in the form in which it proposed to execute the same. The Southern Pacific Company and the Central Pacific Railway Company, by appropriate corporate action, accepted the terms and conditions imposed by the Commission; the Southern Pacific Company on the 15th day of February, 1923, filed with the Commission the required copy of the proposed lease; and on the 3d day of March, 1923, a contract of lease was duly executed by the two companies pursuant to and in conformity with the Commission's said order of approval and authorization.

3. The said order of approval and authorization of the Interstate Commerce Commission is in the words and figures as follows:

"Order.

"At a general session of the Interstate Commerce Commission, held at its office in Washington, D. C., on the 6th day of February, A. D. 1923.

"Finance Docket No. 2613.

"Control of Central Pacific By Southern Pacific.

"In the Matter of the Application of Southern Pacific Company to Acquire Control by Lease and by Stock Ownership of Central Pacific Railway Company.

"A hearing in this proceeding and investigation of the matters and things involved therein having been had, and the commission having, on the date hereof, made and filed a report containing its findings of fact and conclusions thereon, which said report is hereby referred to and made a part hereof:

"1. It is ordered that acquisition by the Southern Pacific Company of control of the Central Pacific Railway by ownership of the capital stock of the Central Pacific Railway Company and under and in accordance with the terms of the proposed lease, as described in the application and report aforesaid be, and the same is hereby, approved and authorized: Provided and upon condition, however,

"(a) That the Southern Pacific Company shall join with the Union Pacific Railroad Company in maintaining via the lines of said companies between Omaha, Neb., and San Francisco Bay points, as parts of one connected continuous line, through passenger, mail, express and freight train service between San Francisco or Oakland, Cal., and Chicago, Ill., at least equal in every respect to that afforded by either with its connections between Los Angeles, Cal., or Portland, Or., and Chicago, Ill.;

"(b) That the Southern Pacific Company shall join with the Union Pacific Railroad Company in maintaining via the lines of said companies between Roseville, Cal., and Omaha, Neb., as parts of one connected continuous line, perishable freight train service from Roseville, Cal., to Chicago, Ill., at

least equal in point of time to that afforded by either with its connections from San Bernardino, or Colton, Cal., to Chicago, Ill.;

"(c) That the Southern Pacific Company shall co-operate with the Union Pacific Railroad Company in the maintenance of train schedules under which neither shall discriminate as to time or service against the other in favor of any other connection through Ogden or Salt Lake City, Utah;

"(d) That the Southern Pacific Company shall at the request of the Union Pacific Railroad Company provide for the publication and maintenance of rates via the Central Pacific Railway through Ogden, Utah, between all points on the lines of the Southern Pacific Company and Central Pacific Railway Company in California, west of Banning, and in Oregon, on the one hand, and Colorado common points and points east thereof, on the other, no higher than apply concurrently between the same points via any other route in which it participates;

"(e) That the Southern Pacific Company shall co-operate with the Union Pacific Railroad Company to secure by active solicitation the routing of the maximum of freight traffic via the lines of the Union Pacific Railroad Company and the Central Pacific Railway Company through the Missouri river and Ogden, Utah, as parts of one connected continuous line, between all points in California and Oregon north of and including Caliente and Santa Margarita, Cal., and south of and including the Klamath Falls branch and Kirk, Or., on the one hand, and points north and west of a line along the northern boundaries of Oklahoma and Arkansas, to the Mississippi river, thence along the Mississippi and Ohio rivers (but not including intermediate cities on the Ohio river) to Wheeling, W. Va., and thence on a line drawn just east of Pittsburgh, Pa., and Buffalo, N. Y., to Niagara Falls, N. Y.;

"(f) That the aforesaid lease shall contain a provision that the same shall become null and void and of no effect whenever this Commission shall find that the control, acquisition of which is herein approved and authorized, interferes with the consummation of the complete plan of consolidation adopted and published under the provisions of section 5 of the Interstate Commerce Act, as amended;

"(g) That the control herein authorized by lease and stock ownership shall be held subject to termination by order of this Commission if and when found by this Commission to interfere with the consummation of its complete plan of consolidation under the provisions of section 5 of the Interstate Commerce Act and for this purpose the Commission reserves full jurisdiction over the case to make such order or orders as, after hearing, it may deem to be necessary and appropriate;

"(h) That the Southern Pacific Company shall not voluntarily sell, pledge, or otherwise dispose of the capital stock of the Central Pacific Railway Company or any part thereof without the consent of this Commission, except that any existing pledge of such stock may be ratified and confirmed;

"(i) That this proceeding may be reopened at any time by order of the Commission, either upon the initiative of the Commission or, in the discretion of the Commission, upon the motion of any person claiming an interest in the matter, for the purpose of making such orders as the Commission may deem necessary or appropriate supplemetary to the present order;

"2. And it is further ordered, that the Southern Pacific Company shall file with this Commission at least ten days before the execution of said lease a copy thereof substantially in the form in which it is proposed to execute the same.

"By the Commission:

"[Seal.]      George B. McGinty, Secretary."

4. The Transportation Act, 1920, conferred upon the Interstate Commerce Commission jurisdiction to entertain said application of the Southern Pacific Company and to make the aforesaid order of approval and authorization.

5. The contract of lease entered into as aforesaid is in the words and figures as follows:

"This lease, made this 3d day of March, 1923, by and between Central Pacific Railway Company, a corporation organized and existing under and by virtue of the laws of the state of Utah, hereinafter at times called 'Central Pacific,' party of the first part, and Southern Pacific Company, a corporation organized and existing under and by virtue of the laws of the state of Kentucky hereinafter at times called 'Southern Pacific,' party of the second part, witnesseth:

"First. The Central Pacific hereby leases to the Southern Pacific, for the period to and including December 31, 1984, subject to termination by order of the Interstate Commerce Commission if and when found by the Commission to interfere with the consummation of its final plan of consolidation, when promulgated, the railroads of the Central Pacific, together with its branches and leased lines, and all depots and station houses, equipments, and appurtenances of every kind and nature whatsoever to the said railroads, branches, and leased lines respectively belonging or appertaining, whether now owned or hereafter acquired or constructed by the Central Pacific as, or in connection with, main lines, extensions or branches: Provided that the automatic extension of this lease to railroad properties hereafter constructed shall be effective only upon the completion of such after-constructed extensions, lines or branches, ready for operation, and as and at the time each new construction is ready for operation.

"Second. The Southern Pacific will pay to the Central Pacific a fixed yearly rental for the premises so leased, amounting to the sum of ten thousand dollars ($10,000.00) per annum, which rental shall be paid in four equal installments of twenty-five hundred dollars ($2,500.00) each on the 1st days of January, April, July, and October of each year during the pendency of this lease, it being understood and agreed that the amount of such rental, so far as requisite, shall be appropriated and applied by the Central Pacific to the expenses of maintaining and keeping up its corporate organization.

"Third. The Southern Pacific is to operate the said railroads, branches and leased lines hereinbefore referred to. The Southern Pacific shall apply the earnings and income derived therefrom to the payment of all operating expenses thereof and the incidental expenses connected therewith, including the sums payable for rentals of leased lines, and according to their lawful priorities, to the payment of the current interest and sinking fund contributions or other payments from time to time becoming due and payable from the Central Pacific to any person, association, or corporation, public or private, during the existence of this lease.

"On the 30th day of April in each year during the continuance of this lease, the Southern Pacific shall pay to the Central Pacific such balance, if any, of the net earnings or income received by the Southern Pacific from the said leased premises, with the appurtenances, for the year ending on the 31st day of December then next preceding, as shall remain in its hands after all the payments hereinbefore provided for or agreed or directed are made: Provided, however, that if at the time, viz., such 30th day of April, when such balance of such income or rental is provided to be paid to the Central Pacific, there shall be any sum due or owing from the Central Pacific to the Southern Pacific for or in respect of advances or payments theretofore made by the Southern Pacific to or for or upon the request of the Central Pacific for new additions or improvements to the demised premises, or any part thereof, or for expenses of keeping up the corporate organization of the Central Pacific or maintaining agencies for the transfer of its stock and bonds, or for any expenses of its business or affairs other than such as fall within the payments before provided to be made by the Southern Pacific out of the earnings or income, or for or in respect of any other sums which may have been lawfully advanced or paid by the Southern Pacific to or for the Central Pacific, the Southern Pacific shall be entitled to retain and pay to itself whatever may be owing to it from the Central Pacific for or in respect of any of the causes or matters or considerations aforesaid including any interest which may be due or owing from the Central Pacific to the Southern Pacific thereon: And provided, further, that if such balance of net earnings or income received by the Southern Pacific from the said leased premises, with the

appurtenances, for any year, and which by the foregoing provisions hereof would be and become payable by the Southern Pacific to the Central Pacific, shall exceed the amount of six per cent. per annum upon the par value of the then existing issued capital stock of the Central Pacific, then and in that event the Southern Pacific shall be entitled to and shall retain to itself for its own use one-half part of any and all excess of such balance of net earnings and income over and above the amount of six per cent. per annum upon the par value of the then existing issued capital stock of the Central Pacific.

"Fourth. If, and so far as the Southern Pacific shall make any advances for payments for account of the Central Pacific, the Southern Pacific shall be entitled to receive lawful interest upon all such advances from the making until the reimbursement thereof, and the Southern Pacific shall be entitled at any time and from time to time to refund to itself such advances and interest out of any net earnings or income of the demised premises which may be in its hands, unless it shall have been expressly agreed between the parties hereto to the contrary, in writing, at or before the making of such advances.

"Fifth. This lease shall and will be subordinated in all its terms and conditions to any future mortgage, deed of trust, or instrument evidencing or establishing a lien for indebtedness made or executed by the Central Pacific upon any or all of the properties hereby leased; and in the event of such mortgage, deed of trust or lien being foreclosed, in whole or in part, this lease shall have no priority with respect to the rights acquired under such instrument creating or evidencing such lien, or under such foreclosure.

"If the capital stock of the Central Pacific now deposited with Central Union Trust Company of New York, as trustee, as security for the payment of the Southern Pacific's 4 per cent. gold bonds (Central Pacific stock collateral) dated August 1, 1899, and maturing on August 1, 1949, shall at any time while any bonds are outstanding under the terms of the deed of trust securing such bonds be sold under the provisions of said deed of trust, such sale shall constitute a termination of this lease.

"Sixth. Pursuant to an order of the Interstate Commerce Commission entered by it on February 6, A. D. 1923, in Finance Docket 2613, entitled 'Control of Central Pacific by Southern Pacific,' this lease shall become null and void and of no effect whenever the said Interstate Commerce Commission shall find that the control, acquisition of which was approved and authorized by said Commission in said order of February 6, 1923, interferes with the consummation of the complete plan of consolidation adopted and published under the provisions of section 5 of the Interstate Commerce Act, as amended.

"In Witness Whereof, the parties hereto have hereunto respectively affixed their corporate seals and caused these presents to be signed by their respective presidents or vice presidents and attested by their respective secretaries or assistant secretaries the day and year first above written.

"Central Pacific Railway Company,
"[Seal.]  By C. H. Redington, Third Vice President.
"(In Quadruplicate.)
"Attest: G. L. King, Secretary.

"Southern Pacific Company,
"[Seal]  By Wm. Sproule, President.
"Attest: G. L. King, Assistant Secretary."

6. The lease of February 17, 1885, between Central Pacific Railroad Company, lessor, and the Southern Pacific Company, lessee, and the subsequent amendments was and is in violation of the Sherman Law and is hereby canceled and annulled.

7. The ownership by the Southern Pacific Company of all or a controlling interest in the capital stock of the Central Pacific Railway Company was at all times in violation of the Sherman Law and continued so to be until February 6, 1923, when such stock ownership was

290 F.—29

found by the Interstate Commerce Commission on the facts adduced before it to be in the public interest and it, accordingly, authorized the acquisition and ownership of said stock control. By virtue of the Commission's aforesaid order of authorization said ownership of said stock under conditions imposed by the Commission is now lawful, and in respect thereof the Southern Pacific Company and the Central Pacific Railway Company are relieved from the operation of the Sherman Law (as well as of all other restraints or prohibitions of law, state or federal), in so far as may be necessary to enable them to do anything authorized or required by the said order of approval and authorization of the Commission.

8. The said contract of lease between the Central Pacific Railway Company, lessor, and the Southern Pacific Company, lessee, entered into under and pursuant to the Commission's said order of approval and authorization is a lawful contract, and in respect thereof the Southern Pacific Company and the Central Pacific Railway Company are relieved from the operation of the Sherman Law (as well as of all other restraints or prohibitions of law, state or federal) in so far as may be necessary to enable them to do anything authorized or required by the Commission's said order of approval and authorization.

It is further ordered, adjudged and decreed:

## Part II.

1. The final decree entered herein on the 9th day of March, 1917, is hereby reversed and set aside.

2. The control of the Central Pacific Railway Company by the Southern Pacific Company through the said new lease approved and authorized by the Commission and through the ownership of stock, also authorized, is a lawful control. The prior unlawful control with which the mandatory requirements of the decision of the Supreme Court were intended to deal has now been succeeded by a situation and relation between the two railways which is lawful, and the executory and directory provisions of said mandate have thus been satisfied or rendered inoperative.

3. The United States shall recover its costs herein, to be taxed by the clerk of the court, and shall have execution therefor.